No. 119,536

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of
W.L. and G.L.,
by and Through Their Mother and Next Friend
M.S.,
*Appellant*,

and

E.L.,
*Appellee*.

SYLLABUS BY THE COURT

1.

The interest of parents in the care, custody, nurture, and control of their children is a fundamental liberty interest protected by the Fourteenth Amendment to the United States Constitution. Any waiver of these constitutionally protected rights must be knowingly, intelligently, and voluntarily made.

2.

K.S.A. 2018 Supp. 23-2301 et seq. authorizes a parent-child relationship to be established by a married couple using Assisted Reproductive Technology (ART) to conceive a child so long as both the spouses and the person who performs the procedure execute and acknowledge a consent in writing. Once this is done, the child is to be "considered at law in all respects the same as a naturally conceived child . . . ." K.S.A. 2018 Supp. 23-2302.

3.

The ART statutes have not been extended to unmarried couples. However, in *Frazier v. Goudschaal*, 296 Kan. 730, 747, 295 P.3d 542 (2013), the Kansas Supreme Court recognized that a parent-child relationship can also be established with a child conceived by ART where there is a written agreement between an unmarried couple in which the biological mother waives her constitutional rights and consents to coparenting with her partner.

4.

An unmarried person who seeks to establish a parent-child relationship with a child conceived using ART must attempt to do so by using the procedure set forth in the Kansas Parentage Act (KPA), K.S.A. 2018 Supp. 23-2201 et seq.

5.

Under K.S.A. 2018 Supp. 23-2220, the provisions of the KPA applicable to determining the existence of a father and child relationship also apply to the mother and child relationship, insofar as practicable.

6.

Under K.S.A. 2018 Supp. 23-2208, the initial burden of proof is on the petitioner to establish by a preponderance of the evidence a presumption of parentage. If the petitioner meets this initial burden, the burden of proof shifts to the respondent to rebut the presumption by clear and convincing evidence. If the presumption is rebutted, the burden of proof shifts back to the petitioner to go forward with the evidence.

7.

Under K.S.A. 2018 Supp. 23-2208(a)(4), a person can establish a presumption of parentage if he or she "notoriously or in writing recognizes [parentage] of the child,

2

including but not limited to a voluntary acknowledgment made in accordance with [Kansas law.]"

8.

The requirements of the KPA are not based on marital status, sexual orientation, or gender. On its face, the KPA applies to both "the mother and child relationship and the father and child relationship." K.S.A. 2018 Supp. 23-2205.

9.

The KPA provides that every child has an interest in his or her parentage, and Kansas public policy requires courts to act in the best interests of children when determining the legal obligations to be imposed and the rights to be conferred in the parent and child relationship.

10.

Determining whether a statute violates the constitution is a question of law subject to unlimited review. Under the separation of powers doctrine, courts presume a statute is constitutional and resolve all doubts in favor of the statute's validity. A statute must clearly violate the constitution before it may be struck down.

11.

The KPA defines a parent-child relationship in terms of biology and adoption. Under the KPA, biological and adoptive parents are treated differently from persons who are not connected to a child by either biology or adoption.

12.

The KPA's distinction between a child's biological or adoptive parents and other persons does not establish a violation of the Equal Protection Clause under the Fourteenth Amendment to the United States Constitution.

Appeal from Crawford District Court; RICHARD M. SMITH, judge. Opinion filed April 19, 2019. Affirmed.

*Valerie L. Moore*, of Lenexa, for appellant.

*Adam M. Hall* and *Sarah E. Warner*, of Thompson Warner, P.A., of Lawrence, for appellee.

Before BRUNS, P.J., SCHROEDER and GARDNER, JJ.

BRUNS, J.:  This appeal arises out of a Petition for Determination of Parentage filed by M.S. under the Kansas Parentage Act (KPA), K.S.A. 2018 Supp. 23-2201 et seq. In the petition, she alleged a parent-child relationship with two minor children, W.L. and G.L., who were conceived by artificial insemination. At the time the children were conceived as well as at the time of their birth, M.S. was in a same-sex relationship with the children's biological mother, E.L. The couple never married and never entered into a written agreement regarding parentage. Likewise, it is undisputed that M.S. is not a biological parent of the children nor did she adopt the children. Instead, M.S. contends that she "notoriously or in writing" recognized parentage of the children. See K.S.A. 2018 Supp. 23-2208(a)(4) and K.S.A. 2018 Supp. 23-2220.

After a two-day bench trial, the district court denied M.S.'s petition for parentage of W.L. and G.L. In doing so, the district court concluded that even if M.S. established by a preponderance of the evidence a presumption under the KPA, E.L. "has convinced the court by clear and convincing evidence that [M.S.] fails to meet the requisite criteria of a psychological, de facto, or functional parent." In particular, the district court found that

4

there was no "meeting of the minds" between M.S. and E.L. regarding the parentage of the children. For the reasons stated in this opinion, we affirm the district court's determination of parentage.

FACTS

M.S. and E.L. both grew up in Pittsburg. In the fall of 2011, the women reconnected as adults when they were both working at the University of Kansas Medical Center in Kansas City. In early 2012, M.S. and E.L. began a romantic relationship that lasted until the end of 2015. Although they lived together in a home in Olathe between February 2012 and January 2016, the couple never married or entered into a civil union.

While they were living together, M.S. and E.L. discussed how each of them would like to have children someday. In October of 2012, M.S. paid for a three-month membership to a sperm bank. The membership allowed the women to log on to a website and view the profiles of potential donors. When this three-month membership expired, E.L. paid for another membership to the sperm bank.

In early 2014, E.L. purchased eight vials of semen from a donor she chose through the sperm bank at a cost of $4,400. At trial, the parties presented conflicting evidence about whether M.S. repaid some of this expense. The parties also disputed the nature and extent of M.S.'s involvement in selecting the sperm donor. According to E.L., she made the final decision and chose the donor based on his personal statement and expressed family values. Moreover, E.L. testified that M.S. had incorrectly identified the donor during her testimony.

After undergoing two unsuccessful insemination attempts, E.L. became pregnant with twins in May 2014. The evidence in the record is conflicting regarding whether M.S. was present during the first two insemination attempts, but it appears that she was present

5

for the third attempt. However, M.S. did not sign an insemination contract with the clinic. Likewise, M.S. was not present at E.L.'s medical visit in late June 2014 when she learned that she was pregnant with twins.

When E.L. found out that she was pregnant, she attempted to involve M.S. in her pregnancy. E.L. sent out a pregnancy announcement including both of their names and a photograph of both M.S. and E.L. The announcement indicated that the L.-S. twins would be arriving in January 2015. At a baby shower hosted by E.L.'s sisters, M.S. and E.L. opened the gifts together. During the pregnancy, M.S. attended some prenatal doctor's appointments with E.L. but not others. Unfortunately, E.L. had a difficult pregnancy—including late-term preeclampsia requiring several hospitalizations. Although E.L. described her social life as active before the pregnancy, she testified that her lifestyle "changed drastically" as soon as she found out she was pregnant.

Evidently, M.S. did not change her lifestyle while E.L. was pregnant and continued to party with friends. The night before E.L. gave birth, M.S. attended a Christmas party sponsored by her employer and then went to an "after party" at a friend's house. E.L.'s mother, who was staying with her, picked M.S. up from the after party and took E.L. with her to help locate the house. Even though E.L. was in pain and "in tears," M.S. had E.L.'s mother make an early morning stop at McDonald's on the way home. A few hours later, when E.L.'s water broke, M.S. was still drunk. E.L.'s mother drove both women to the hospital. While E.L. was in labor, she asked M.S. to "please, please scooch back a little bit" because M.S. still smelled of alcohol.

The children were born on December 20, 2014. Although M.S. was not listed as a parent on the birth certificate, E.L. requested that the last name of the children include M.S.'s last name. Evidently, this was not something that E.L. and M.S. had discussed beforehand. According to E.L., this was something she wanted to do so that M.S. would feel included. Over the next year, M.S. and E.L. lived together with the children. E.L.

6

testified that during this time she made all of the major parenting decisions—including daycare, nutrition, and healthcare decisions. However, M.S. did contribute significantly to the household financially and helped to pay for daycare, healthcare, and various other expenses.

E.L. became concerned because M.S. did not change her lifestyle after the children were born. In May 2015, although the children were very sick, M.S. went out with a friend. In July 2015, M.S. called E.L. to say she had been in a car accident. E.L. took the children with her in the middle of the night to try to find M.S. After driving around for about an hour and a half, E.L. found M.S. after she spotted the flashing lights of a police car. M.S. was taken to jail and received a citation for DUI. In September 2015, several members of E.L.'s family visited the couple for the weekend. M.S. had been drinking heavily, and E.L. found her having sex with E.L.'s sister's boyfriend in the backyard. The children were in their bedroom sleeping at the time. The next morning, M.S. packed a bag and left for a week. After M.S. returned, E.L. said she tried to fix things and even went to a counselor, but she knew the relationship was irreparable because M.S. had also hurt several members of her immediate family.

In October 2015, E.L. decided to end her relationship with M.S. and began looking for a job in Pittsburg. In January 2016, E.L. moved to Pittsburg. About a month after the move, E.L. amended the children's birth certificates to include only her last name. As such, they are now known as W.L. and G.L. A month or two later, M.S. also moved to Pittsburg to live with her parents. During the transition, E.L. allowed M.S. to come by and see the boys whenever she was in town to see her parents. Beginning in June 2016, E.L. began allowing the children to stay overnight with M.S. at her parents' house in Pittsburg every other weekend. In January 2017, E.L. also began allowing M.S. to see the children once during the week.

According to E.L., M.S. continued to act in a manner that caused her concern. E.L. learned that M.S. had taken the children out of the state with M.S.'s new girlfriend without first asking her permission. Moreover, E.L. learned that M.S. had driven with the children in the car while she was intoxicated. M.S. had her girlfriend start the car for her by blowing into a mandatory interlock device installed after M.S.'s previous DUI. In addition, E.L. had concerns about M.S.'s interactions with the children while she was presenting symptoms of a strain of the herpes virus. It also appears that M.S. represented herself to medical staff as E.L.—including signing E.L.'s name and using her Social Security number—in order to receive healthcare for the children.

A year after E.L. moved to Pittsburg, she began dating C.H. In July 2017, E.L. and C.H. moved in together with the children. In January 2018, E.L. and C.H. were married. According to E.L., C.H. immediately established a good relationship with the children. After E.L. and C.H. were married, they consulted an attorney about the possibility of C.H. adopting the children.

In the late summer of 2017, M.S. texted E.L. and indicated that she was considering moving back to Kansas City. A meeting was setup with E.L., C.H., M.S., and M.S.'s girlfriend to discuss future visitation with W.L. and G.L. When M.S. asked E.L. about the possibility of becoming a guardian for the children, the conversation "went very south." Subsequently, E.L. sent an email to M.S. telling her that she did not think she understood her role. At that point, M.S. contacted a lawyer.

On October 6, 2017, M.S. filed a petition for determination of parentage in which she asserted that the district court should find her to have a parent-child relationship with W.L. and G.L. After the original district court judge recused, the Kansas Supreme Court appointed Senior Judge Richard M. Smith to hear the case on October 24, 2017. Senior Judge Smith handled all of the proceedings after that point.

8

In response to the petition, E.L. filed a motion to dismiss, arguing M.S. could not meet the definition of a parent under the Kansas Parentage Act. In opposing the motion, M.S. argued that she was

"entitled to a hearing on that claim, and the children are entitled to representation to determine whether it is in their best interests to sever that bond, pursuant to [*In re Marriage of Ross*, 245 Kan. 591, 783 P.2d 331 (1989)] and [*Frazier v. Goudschaal,* 296 Kan. 730, 295 P.3d 542 (2013)]. Thus, the court should order an independent custody evaluation and/or appoint a *guardian ad litem* ('GAL') to represent the children's best legal interests."

On November 29, 2017, the district court held a hearing on the motion. At the hearing, the parties agreed to a temporary visitation plan pending the trial. In a journal entry entered on December 12, 2017, the district court ordered that M.S. be granted visitation with the children "[p]ending a hearing on . . . the underlying Petition for Establishment of Parentage . . . ." After listening to the arguments of counsel, the district court appointed a guardian ad litem (GAL) to represent the best interests of W.L. and G.L. According to the district court, the purpose of appointing a GAL was to:

"(1) give an opinion under [*In re Marriage of Ross*, 245 Kan. 591, 783 P.2d 331 (1989)] as to whether or not it is in the children's best interest to have maternity established; (2) an opinion as to whether it is in the children's best interests to have the Petitioner declared their legal mother; and (3) if the Petitioner is declared to be the children's legal parent, the appropriate parenting plan for the minor children in accordance with the children's best interests."

The GAL, Maradeth Frederick, filed a written report with the district court on February 6, 2018. In her seven-page report, Frederick concluded that "[i]t would not be in the best interests of the children to determine maternity and establish [M.S.] as their legal mother."

9

A two-day bench trial was commenced on April 26, 2018. During the trial, the district court heard testimony from M.S., E.L., the children's former nanny, another former daycare provider, the women's parents, M.S.'s ex-girlfriend, M.S.'s current girlfriend, and E.L.'s wife. The GAL representing the children was present and participated in the examination of witnesses.

In her testimony, M.S. acknowledged that there was no coparenting or guardianship agreement between the parties. She also acknowledged that she had not previously taken any action to become a legal parent of the children, and she was not aware of any legal documents that list her as being their parent. M.S. further acknowledged that she and E.L. were never married—either before or after the children were born. Likewise, she acknowledged that E.L. claimed the children as dependents on her tax returns.

Instead, M.S. testified that she considered the boys to be her children and she thought of herself as their mother. She said she never felt like she had to file a legal action prior to October 2017 because even though she was not able to make legal decisions on behalf of the children, she felt like she "was a parent from the doctors, from the daycare providers, even by [E.L.]." M.S. said the boys called her "Mama." When the children were with M.S., she was their primary caregiver. She said she fed them, bathed them, read to them, provided discipline, and played with them. M.S. said she believes the children see her as their mother because they feel her love and support and go to her for comfort.

In her testimony, E.L. testified that she never saw M.S.'s role in the children's lives as a parent. E.L. said she was hopeful that M.S. would be able to assume the role of a parent, but that hope ended on the day that M.S. cheated on her. When asked about M.S.'s role in the children's lives, E.L. testified that the children enjoy their time with her, but they also enjoy their time with other people in their lives. E.L. said she never discussed

10

with M.S. what would happen with the children if something happened to her, but she did have that discussion with her mother. E.L. granted power of attorney to her parents, and E.L. knew that if something happened to her during childbirth, the children would go to her parents. E.L. testified she believes M.S. loves the children, but that M.S. was not ready to be a parent.

After hearing the evidence and arguments of counsel, the district court took the matter under advisement and kept the temporary visitation order in place. On May 10, 2018, the district court issued an order modifying its previous visitation order and revoking M.S.'s temporary visitation with the children. Less than two weeks later, on May 22, 2018, the district court issued a comprehensive decision and order. In denying M.S.'s petition for parentage, the district court observed that the facts of this case are highly contested, finding:

> "On many material issues the court had to weigh and evaluate the credibility of the testimony against objective or otherwise known values, against the credibility of witnesses testifying to the contrary, and against common knowledge and experience. On many of these important factors the divergence in testimony may have been more of a matter of one's individual perception than purposeful misrepresentation. Nevertheless, there were instances where it was apparent to this court that some of these differences went beyond just perception and were the result of intentional attempts to appear in a more favorable light. After considering each witness's appearance, demeanor, motives in testifying, apparent candor or lack thereof, and generally weighing the credibility of the testimony not only individually but against contravening testimony the court found the evidence of the respondent more persuasive. In particular [E.L.'s] testimony was more believable, credible, and worthy of weight than the testimony of [M.S.], particularly where the [two] were in conflict."

After analyzing the law, the district court ultimately concluded that the evidence "is more indicative of [M.S.] being a ride along than an active participant in the determination to form a parent-child relationship." The district court recognized that M.S.

11

had presented evidence tending to support a presumption of parentage, including her financial contributions, her move to Pittsburg, her visitation time with the children, and the fact that the children's birth certificate originally listed their last names as L.-S. The court found, however, that E.L. had rebutted any presumption by clear and convincing evidence. Specifically, the district court concluded that "[i]f the petitioner has established by a preponderance of the evidence a presumption under the Kansas Parentage Act, the respondent has convinced the court by clear and convincing evidence that [M.S.] fails to meet the requisite criteria of a psychological, de facto, or functional parent."

The district court found that there had been "no meeting of the minds" or mutual consent between the parties. The district court was "convinced that there was a time in which [E.L.] truly hoped that [M.S.] would focus her attention on the family unit and act in a fashion expected of one who truly intends to assume the responsibilities of being a parent." However, the district court concluded that the parties had never availed themselves to recognized legal avenues through which a person without a biological connection to a child can become a parent.

In particular, the district court found it significant that M.S. and E.L. never married—even after the children were born, never picked up the rings that they had ordered from a jeweler, and never entered into any written agreements regarding artificial insemination or otherwise recognizing M.S. as a parent. Finally, the district court concluded "by clear and convincing evidence that it is not in the children's best interests to establish a parent-child relationship between [M.S.] and the children."

ANALYSIS

*Establishing a Parent-Child Relationship in Kansas*

The United States Supreme Court has long recognized the constitutionally protected liberty interest of a parent. See *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000). In *Troxel*, the United States Supreme Court found that the interest of parents in the care, custody, and control of their children is "perhaps the oldest of the fundamental liberty interests" protected by due process. 530 U.S. at 65. "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S. Ct. 438, 88 L. Ed. 645 (1944). Any waiver of these constitutionally protected rights must be knowingly, intelligently, and voluntarily made. See *Frazier v. Goudschaal*, 296 Kan. 730, 751, 295 P.3d 542 (2013).

Historically, there were three primary ways to create a parent-child relationship: (1) giving birth to a child; (2) being married to the child's mother at the time of the birth; or (3) adopting the child.

> "Fifty years ago, becoming a parent was relatively simple. A male and female who engaged in sexual intercourse might conceive a child. If the male and female were married (or became married), maternity and paternity were rarely issues because of the nearly irrebuttable presumption of legitimacy and the absence of technology to disprove paternity. Today, there are numerous types of artificial reproductive techniques including artificial insemination, surrogate motherhood, and in-vitro fertilization, among others." 1 Elrod, Kansas Law and Practice: Kansas Family Law § 4:31 (2018).

In response to modern reproductive procedures, the Kansas Legislature enacted K.S.A. 2018 Supp. 23-2301 et seq., to allow a married couple—as well as the person who performs the procedure—to "consent in writing" to parent a child using Assisted

13

Reproductive Technology (ART). K.S.A. 2018 Supp. 23-2303. If this is done, the child conceived by ART will be "considered at law in all respects the same as a naturally conceived child . . . ." K.S.A. 2018 Supp. 23-2302.

Under *Obergefell v. Hodges*, 576 U.S. ___, 135 S. Ct. 2584, 192 L. Ed. 2d 609 (2015), the ART statute would apply equally to all married couples even though it uses the term "husband and wife" in various provisions. To date, the ART statutes have not been extended to unmarried couples. This is true regardless of whether the unmarried couple is in a heterosexual or same-sex relationship. However, the Kansas Supreme Court recognized that a parent-child relationship could also be established with a child conceived by ART where there is a written agreement between an unmarried couple in which the biological mother waives her constitutional rights and consents to coparenting with her partner. *Frazier*, 296 Kan. at 747.

An unmarried person who seeks to establish a parent-child relationship with a child conceived using ART must attempt to do so by using the procedure set forth in the Kansas Parentage Act (KPA), K.S.A. 2018 Supp. 23-2201 et seq. The KPA expressly defines "parent and child relationship" to mean "the legal relationship existing between a child and the child's *biological or adoptive* parents incident to which the law confers or imposes rights, privileges, duties and obligations." (Emphasis added.) K.S.A. 2018 Supp. 23-2205. Nevertheless, our Supreme Court has found that "[a] harmonious reading of all of the KPA provisions indicates that a female can make a colorable claim to being a presumptive mother of a child without claiming to be the biological or adoptive mother." 296 Kan. at 747.

Under K.S.A. 2018 Supp. 23-2220, "the provisions of the [KPA] applicable to determining the existence of a father and child relationship also apply [to the mother and child relationship], insofar as practicable." *Kline v. Holmes*, No. 118,067, 2018 WL 1659927, at *5 (Kan. App. 2018) (unpublished opinion). Unfortunately, the Kansas

14

Legislature has not provided courts with guidance as to what is the "practicable" way—if there is one—to apply the KPA in cases in which an unmarried person can establish a parent-child relationship with a child conceived by ART without claiming to be a biological parent or an adoptive parent. See *Higgins v. Abilene Machine, Inc.*, 288 Kan. 359, 364, 204 P.3d 1156 (2009) (noting that it is the role of the Legislature to provide "the guidance of public policy through statutes"). In the meantime, Kansas courts are left with a situation similar to trying to fit a square peg in a round hole—even when it can be done, the fit is usually not very good.

*Standard of Review*

Under the KPA, the initial burden of proof is on the petitioner to establish by a preponderance of the evidence a presumption of parentage. If the petitioner meets this initial burden, the burden of proof shifts to the respondent to rebut the presumption by "clear and convincing" evidence. If the presumption is rebutted, the burden of proof shifts back to the petitioner to go forward with the evidence. K.S.A. 2018 Supp. 23-2208(b); see also *Kline*, 2018 WL 1659927, at \*5-7.

"'In Kansas, a district court's factual findings are reviewed under the substantial competent evidence standard.'" *State ex rel. Secretary of DCF v. Smith*, 306 Kan. 40, 54, 392 P.3d 68 (2017) (quoting *State v. Gonzalez*, 290 Kan. 747, 756, 234 P.3d 1 [2010]). Substantial evidence is such legal and relevant evidence as a reasonable person might regard as sufficient to support a conclusion. *Hodges v. Johnson*, 288 Kan. 56, 65, 199 P.3d 1251 (2009). Stated another way, substantial evidence is "'evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved.'" *Wiles v. American Family Life Assurance Co.*, 302 Kan. 66, 73, 350 P.3d 1071 (2015).

On appeal, we are not to weigh conflicting evidence, pass on the credibility of witnesses, or otherwise independently decide disputed questions of fact. *Cresto v. Cresto*, 302 Kan. 820, 835, 358 P.3d 831 (2015); *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008). In other words, any conflicts in evidence must be resolved to the benefit of the party that prevailed before the district court. On the other hand, our review of the district court's conclusions of law is unlimited. *American Special Risk Management Corp. v. Cahow*, 286 Kan. 1134, 1141, 192 P.3d 614 (2008). Likewise, to the extent that a case involves an interpretation of a statute, our review is also unlimited. *Neighbor v. Westar Energy, Inc.*, 301 Kan. 916, 918, 349 P.3d 469 (2015).

*Presumption of Parentage*

As indicated above, the KPA expressly defines "parent and child relationship" to mean "the legal relationship existing between a child and the child's *biological or adoptive* parents incident to which the law confers or imposes rights, privileges, duties and obligations." (Emphasis added.) K.S.A. 2018 Supp. 23-2205. This overarching definition is applicable to the entire KPA. In most cases, it is relatively easy to identify a biological mother because the birth mother's name is usually listed on the birth certificate. Likewise, it is relatively easy in most cases to identify an adoptive parent based on court orders or a parent who has participated in ART based on his or her written consent. But a biological father is not always as easy to identify. For that reason, K.S.A. 2018 Supp. 23-2208(a) lists a variety of ways in which a man may be presumed to be the father of a child.

Over the years, the presumptions set forth in the KPA have been used in a number of different ways. They have been used by mothers seeking child support, by the State seeking reimbursement of expenses, by children seeking to inherit assets from a father's family, by men seeking to be recognized as a child's father, and by putative fathers seeking to challenge an adoption. More recently, there have been several cases brought in

16

Kansas in which a woman attempts to use a presumption in the KPA as an avenue to establish legal parentage of a child even though she is neither the biological nor adoptive mother of the child. See, e.g., *Frazier*, 296 Kan. at 746; *Kline*, 2018 WL 1659927, at *5; *Downs v. Gilmore*, No. 108,176, 2013 WL 1010667, at *3 (Kan. App. 2013) (unpublished opinion).

Here, it is undisputed that E.L. is the biological mother of W.L. and G.L. Likewise, there is no written agreement between the parties regarding parentage. Nevertheless, M.S. contends that she is presumed to have a parent-child relationship with W.L. and G.L. pursuant to K.S.A. 2018 Supp. 23-2208(a)(4). Under K.S.A. 2018 Supp. 23-2208(a)(4), one can establish a presumption of parentage if the person "notoriously or in writing recognizes [parentage] of the child, including but not limited to a voluntary acknowledgment made in accordance with [Kansas law.]"

A review of the record reveals that the district court did not expressly decide whether there was sufficient evidence presented by M.S. to establish a presumption by a preponderance of the evidence. Instead, it appears that the district court assumed for the sake of argument that M.S. had met her initial burden to establish the existence of a presumption and shifted its analysis to whether E.L. had met her burden to rebut the presumption by clear and convincing evidence under K.S.A. 2018 Supp. 23-2208(b). We note that the district court found that there was "[c]redible evidence potentially establishing a parentage presumption" including the fact that E.L. originally listed the children's names with a hyphenated version of her name and M.S.'s name.

Although it would have been better for the district court to have made a specific ruling on the question of whether M.S. met her initial burden to establish a presumption of parentage by a preponderance of the evidence, we find any error to be harmless under the circumstances presented in this case. In particular, we find it to be significant that

17

M.S. received the benefit of the presumption when the district court shifted the burden of proof to E.L. to overcome the presumption by clear and convincing evidence.

*Rebuttal of Presumption*

The primary issue presented in this case is whether the district court erred in concluding that E.L. established by clear and convincing evidence that M.S. is not a parent of W.L. and G.L. Under K.S.A. 2018 Supp. 23-2208(b), a presumption of parentage may be rebutted by clear and convincing evidence. Clear and convincing evidence is "an intermediate standard of proof between a preponderance of the evidence and beyond a reasonable doubt." *In re B.D.-Y.*, 286 Kan. at 691. To be clear and convincing, the factfinder must believe "'that the truth of the facts asserted is highly probable.'" *In re Adoption of C.L.*, 308 Kan. 1268, 1278, 427 P.3d 951 (2018) (quoting *In re B.D.-Y.*, 286 Kan. at 697).

In the present case, we start with the premise that E.L.—as the biological mother of the children—has a fundamental right, protected by the United States Constitution, to raise her children. *Troxel*, 530 U.S. at 65. Although much of the evidence in this case was vigorously contested, it is undisputed that there was never a written agreement executed by the parties in which E.L. waived her constitutional rights regarding parentage. There was no written agreement executed by the parties prior to utilizing ART to conceive the children, there was no written agreement executed during E.L.'s pregnancy, and there has been no written agreement executed since the children have been born.

Unfortunately, as this case highlights, "without a written contract, the likelihood of post conception or post-birth disagreement and litigation is increased." Margalit, *Bridging the Gap Between Intent and Status: A New Framework for Modern Parentage*, 15 Whittier J. Child & Fam. Advoc. 1, 30-31 (2016). Discussing the Kansas Supreme

Court's decision in the case *In re K.M.H.*, 285 Kan. 53, 74, 169 P.3d 1025 (2007), Professor Linda Henry Elrod of Washburn University School of Law wrote:

> "In Kansas, the *absence of a written agreement* between a biological mother and a sperm donor meant that the sperm donor had no rights. The court indicated that *the writing requirement* to give a sperm donor rights *'enhances predictability, clarity, and enforceability.'* The same argument could be applied to partners who chose to create parenting relationships through ART (or one parent adoption). *The biological parent's consent to the creation of the parent-child relationship with the partner is a critical waiver of the biological parent's constitutionally-protected exclusive right to parenthood.* That consent is the boundary distinguishing true parent-like persons from grandparents, caretakers, other third parties or legal strangers, who do not deserve parental rights or responsibilities." (Emphasis added.) Elrod, *A Child's Perspective of Defining a Parent: The Case for Intended Parenthood*, 25 BYU J. Pub. L. 245, 267-68 (2011).

We agree with Professor Elrod that written agreements or consents in cases involving ART are critical. Not only do written agreements provide "predictability, clarity, and enforceability" in cases such as this, they are crucial in protecting the rights of the parties as well as the best interests of the children who are the subjects of such an agreement. Elrod, 25 BYU J. Pub. L. at 268. We also note that the importance of obtaining the written consent of a biological parent is recognized throughout Kansas statutory and case law:

- In the absence of a judicial termination of parental rights, a biological parent must consent to adoption in writing. See K.S.A. 2018 Supp. 59-2114 and K.S.A. 59-2115.

- Both the biological and putative parent must sign a written voluntary acknowledgement of paternity. K.S.A. 2018 Supp. 23-2204.

19

- In cases involving married couples using ART, both the biological parent and the nonbiological parent must sign a written consent before the procedure. K.S.A. 2018 Supp. 23-2303.

- Unmarried couples using ART may enter into a written coparenting agreement signed by both the biological parent and nonbiological parent. *Frazier*, 296 Kan. at 753; see also *In re K.M.H.*, 285 Kan. at 74 ("If these parties desire an arrangement different from the statutory norm, they are free to provide for it, as long as they do so in writing.").

In *Frazier*, the Kansas Supreme Court found that two written coparenting agreements signed by a biological mother and her same-sex partner regarding the parentage of two children conceived through artificial insemination were enforceable. In the written agreements, the partner was identified as a "de facto parent" and both parties expressed their intent "to jointly and equally share parental responsibility." The written agreements also provided the parties would pay child support and "that all major decisions affecting [the] children . . . shall be made jointly by both parties." In addition to the written agreements, the parties executed consents for the children's medical treatment and durable powers of attorney for health care decisions. Furthermore, each party executed a will naming the other as the children's legal guardian. 296 Kan. at 733-34.

The majority in *Frazier* found that the "parental preference can be waived and . . . courts should not be required to assign to a mother any more rights than that mother has claimed for herself." 296 Kan. at 753 (citing *In re Marriage of Nelson*, 34 Kan. App. 2d 879, 125 P.3d 1081[2006]). Ultimately, the *Frazier* majority concluded that by signing the written coparenting agreements, the biological mother had "exercised her due process right to decide upon the care, custody, and control of her children and asserted her preference as a parent . . . ." 296 Kan. at 753. Although M.S. argues that Kansas courts "consistently have declined" to recognize "'de facto' parents," the *Frazier* majority

20

expressly recognized the designation in the written agreements that the biological mother's partner is a "de facto parent." 296 Kan. at 752-53; see also *In re Adoption of T.M.M.H.*, 307 Kan. 902, 914, 416 P.3d 999 (2018).

Based on our review of Kansas law, we find the absence of either a written waiver of E.L.'s constitutional rights or a written agreement between the parties regarding parentage to be compelling. In other words, by showing that there was never a written agreement between the parties, we find that E.L. met her burden to overcome the presumption in favor of M.S. We also note that M.S. has not alleged the existence of an oral agreement in this case. Accordingly, we conclude that the district court's finding that "there was never really a 'meeting of the minds' . . . regarding parentage" is supported by clear and convincing evidence.

Notwithstanding, M.S. argues that E.L. "'consented and fostered' a parental relationship" by her actions. These actions include jointly attending the insemination appointment, announcing the pregnancy on Facebook, and having a joint baby shower. M.S. also points out that she was in the operating room when the children were delivered and the children originally had a hyphenated name. In light of the holdings in *Frazier* and *In re K.M.H.*, we do not believe our Supreme Court would recognize a parentage agreement in an ART case unless it is in writing.

Even if our Supreme Court were to expand its holding in *Frazier* to hold that a written agreement is not required, the issue of whether a biological parent has waived his or her constitutional rights is a question of fact. *In re Marriage of Nelson*, 34 Kan. App. 2d at 884 ("When determining whether rights are knowingly waived, this court determines whether there is substantial competent evidence to support the district court's ruling."). As we previously noted, we do not reweigh the evidence or pass on the credibility of witnesses. Instead, we must review the facts in the light most favorable to

21

the party prevailing below in order to determine whether the district court's ruling is supported by clear and convincing evidence. *In re B.D.-Y.*, 286 Kan. at 705.

In determining that E.L. had successfully rebutted M.S.'s presumption of parentage by clear and convincing evidence, the district court found E.L.'s testimony to be more credible than M.S.'s testimony. Specifically, the district court found:

"After considering each witnesses' appearance, demeanor, motives in testifying, apparent candor or lack thereof, and generally weighing the credibility of the testimony not only individually but against contravening testimony the court found the evidence of [E.L.] more persuasive. In particular [E.L.'s] testimony was more believable, credible, and worthy of weight than the testimony of [M.S.], particularly when the [two] were in conflict."

After hearing all the evidence presented over the course of the two-day bench trial, the district court determined that "the testimony of [E.L.] was . . . more credible and reliable" as to the intent of the parties. Although the district court recognized that there was "some credible evidence" to support M.S.'s position, it determined that "[t]he evidence is more indicative of petitioner being a ride along than an active participant in the determination to form a parent-child relationship." The district court also found that it was "convinced that [E.L.] remains the most credible source of evidence when it comes to the parties' intent and their interactions."

Reviewing the record in a light most favorable to the prevailing party, we find the findings of the district court to be supported by clear and convincing evidence. It is important to recognize that although there was a substantial amount of conflicting evidence presented during the bench trial, much of the evidence offered by E.L. to rebut M.S.'s presumption was undisputed. In addition to not entering into a written agreement regarding ART or parentage, it is undisputed that the parties never married and that M.S. never attempted to obtain E.L.'s consent to adopt the children. There is also undisputed

22

evidence in the record that M.S. did not inquire about the possibility of becoming the children's legal guardian until more than three years after the children were born.

In addition to the undisputed evidence in the record, there is substantial evidence upon which a reasonable person could find that M.S.'s involvement with the children was primarily incidental rather than sharing in the responsibilities of parenting. As the district court recognized, there was "a time in which [E.L.] truly hoped that [M.S.] would focus her attention on the family unit and act in a fashion expected of one who truly intends to assume the responsibilities of being a parent." However, after hearing all the evidence, the district court concluded that E.L.'s hopes remained unfulfilled. We find this to be a reasonable inference from the evidence presented.

Ultimately, the district court found the testimony of E.L. to be more credible than that of M.S., and we cannot replace our judgment for that of the district court regarding questions of fact. Based on our review of the record in a light most favorable to the prevailing party below, we conclude that substantial competent evidence supports the district court's factual findings and that the inferences drawn from the evidence by the district court were reasonable. We also conclude that there is substantial competent evidence in the record to support the district court's finding that E.L. rebutted M.S.'s presumption of parentage by clear and convincing evidence. Lastly, we conclude that the district court's determination that M.S. was unable to overcome E.L.'s clear and convincing evidence regarding parentage is supported by substantial competent evidence in the record.

*Consideration of Best Interests of the Children*

M.S. contends the district court erred by considering the best interests of W.L. and G.L. in reaching its decision. She recognizes that "courts strive to avoid harm to children; however, 'best interests' is not and cannot be the linchpin in making a determination of

parentage." At the outset, we note that M.S. is the one who initially requested that the district court "appoint a guardian ad litem (GAL) to represent the children's best interests." As such, to the extent that M.S. may be suggesting that the district court erred in considering the GAL's best interests recommendation, we decline to review this argument because she invited any error by requesting that the district court appoint a GAL. See *Thoroughbred Assocs. v. Kansas City Royalty Co.*, 297 Kan. 1193, 1203, 308 P.3d 1238 (2013).

The KPA provides that that every child has an interest in his or her parentage. *In re Marriage of Ross*, 245 Kan. 591, 597, 783 P.2d 331 (1989). In fact, "Kansas public policy 'requires our courts to act in the best interests of the children when determining the legal obligations to be imposed and the rights to be conferred in the' parent and child relationship." *State ex rel. Secretary of DCF v. Smith*, 306 Kan. at 59 (quoting *Frazier*, 296 Kan. at 747). We also note that in enforcing the written agreements in *Frazier*, our Supreme Court found that the effect "of the arrangement was to promote the welfare and best interests of the children." 296 Kan. at 751. Consequently, although the extent to which a child's best interests should be considered in a particular case may be subject to debate, it is imperative that Kansas courts take into consideration the best interests of the child in cases such as this that affect the parent-child relationship.

In this case, the district court found that even if M.S. established a presumption of parentage by a preponderance of the evidence, E.L. rebutted the presumption by clear and convincing evidence. Next, the district court found that M.S. had "not overcome [E.L.'s] clear and convincing evidence rebutting any statutory presumption." Only after completing this analysis as required by the KPA did the district court go on to state: "In addition to these findings the court makes this specific finding that it appears by clear and convincing evidence that it is not in the children's best interests to establish a parent-child relationship between [M.S.] and the children."

24

Although the district court did not need to go on and make a best interests determination under these circumstances, it was not error for it to do so. Here, the district court considered the best interests of the children as an additional reason to deny M.S.'s petition and not as the primary factor in reaching its conclusion. As our Supreme Court has recognized, public policy dictates that "our courts . . . act in the best interests of the children when determining the legal obligations to be imposed and the rights to be conferred in the mother and child relationship." *Frazier*, 296 Kan. at 747. Therefore, we cannot fault the district court for considering the best interests of the children in this case.

*Equal Protection*

M.S. also contends that the KPA—as applied in this case—is not gender neutral and violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Likewise, M.S. argues that the district court held her to a higher standard than it would hold a similarly situated male under similar circumstances. In response, E.L. contends that the Kansas Legislature's decision to distinguish between a child's biological or adoptive parents and persons who do not have a biological or adoptive connection to the child does not violate the Equal Protection Clause.

In *Miller v. Johnson*, 295 Kan. 636, Syl. ¶ 1, 289 P.3d 1098 (2012), the Kansas Supreme Court summarized the standard of review in determining the constitutionality of a statute:

> "Determining whether a statute violates the constitution is a question of law subject to unlimited review. Under our state's separation of powers doctrine, courts presume a statute is constitutional and resolve all doubts in favor of the statute's validity. A statute must clearly violate the constitution before it may be struck down."

In *Board of Miami County Comm'rs v. Kanza Rail-Trails Conservancy, Inc.*, 292 Kan. 285, 315, 255 P.3d 1186 (2011), our Supreme Court reemphasized that "[w]hen the

25

constitutionality of a statute is challenged on the basis of an equal protection violation, courts must construe the statute as constitutional if there is any reasonable way to do so." The "burden is on the party attacking the statute to prove otherwise." *Barrett v. U.S.D*., *No. 259*, 272 Kan. 250, Syl. ¶ 2, 32 P.3d 1156 (2001); see *Miller*, 295 Kan. 636, Syl. ¶ 1 (presumption of constitutionality is part and parcel of Kansas' separation of powers). Both the Kansas and United States Supreme Courts have emphasized that "equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Downtown Bar & Grill, LLC v. State*, 294 Kan. 188, 199, 273 P.3d 709 (2012) (quoting *F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307, 313, 113 S. Ct. 2096, 124 L. Ed. 2d 211 [1993]).

As noted, "[t]he guiding principle of equal protection analysis is that similarly situated individuals should be treated alike." See *In re K.M.H.*, 285 Kan. 53, 73, 169 P.3d 1025 (2007). As such, the guarantees under the state and federal Equal Protection Clauses "are implicated when a statute treats arguably indistinguishable classes of people differently." *In re Tax Appeal of Weisgerber*, 285 Kan. 98, 104, 169 P.3d 321 (2007). "Once it is determined that a particular classification system arguably treats similarly situated persons differently and so implicates equal protection, a court must determine which level of scrutiny should be employed to evaluate the constitutionality of that classification." 285 Kan. at 104.

> "Federal and Kansas courts have long delineated three levels of scrutiny in equal protection cases:  (1) the rational basis test to determine whether a statutory classification bears some reasonable relationship to a valid legislative purpose; (2) the heightened scrutiny test to determine whether a statutory classification substantially furthers a legitimate legislative purpose; and (3) the strict scrutiny test to determine whether a statutory classification is necessary to serve some compelling State interest." *In re Tax Appeals of CIG Field Services Co.*, 279 Kan. 857, 878, 112 P.3d 138 (2005) (citing *Bair*, 248 Kan. at 830-31).

26

M.S.'s equal-protection challenge fails on the threshold issue, as she cannot show the KPA treats "'arguably indistinguishable' classes of people differently." *Weisgerber*, 285 Kan. at 106. We do not find someone in a relationship with another person—whether the relationship is heterosexual or same-sex—to be similarly situated to a biological or adoptive parent for equal-protection purposes. Additionally, in reviewing the KPA in light of this standard, we find that the requirements of the KPA are not based on marital status, sexual orientation, or gender.

As indicated above, the KPA defines the parent-child relationship in terms of biology or adoption. On its face, the KPA applies to both "the mother and child relationship and the father and child relationship." K.S.A. 2018 Supp. 23-2205. In addition, it applies "equally to every child and to every parent, regardless of the marital status of the parents." K.S.A. 2018 Supp. 23-2206. The KPA further provides that "[a]ny interested party may bring an action to determine the existence or nonexistence of a mother and child relationship" and that "[i]nsofar as practicable, the provisions of this act applicable to the father and child relationship apply." K.S.A. 2018 Supp. 23-2220. Moreover, the provisions of the KPA extend to same-sex couples pursuant to the United States Supreme Court's decision in *Obergefell v. Hodges*, 576 U.S. ___, 135 S. Ct. 2584, 192 L. Ed. 2d 609 (2015).

As we have previously noted, a biological parent has a fundamental constitutional right to make decisions about the upbringing of his or her children. See *Troxel*, 530 U.S. at 65; *Frazier*, 296 Kan. at 752-53. Adoptive parents—including those who comply with the ART statute—have the same rights. *In re Adoption of A.A.T.*, 287 Kan. 590, 612, 196 P.3d 1180 (2008). Those who are not connected to a child by biology or adoption do not share these rights. See *State v. Williams*, 254 Kan. 814, 826-28, 869 P.2d 661 (1994). Thus, the distinction between biological or adoptive parents and those who do not have such a connection recognizes an appropriate boundary between those whose fundamental rights must be protected and those who do not inherently have such rights.

27

It is important to recognize that the KPA does not prevent someone in M.S.'s situation from establishing a parent-child relationship with a nonbiological child. As we stated earlier in this opinion, a person—male or female—who lacks a biological or adoptive connection with a child can still establish a parent-child relationship. For example, a person in this position could seek permission to adopt the child or could enter into a written coparenting agreement with the biological parent and enforce it under the provisions of the KPA. See *Frazier*, 296 Kan. at 753; see also *In re K.M.H.*, 285 Kan. at 74. Here, M.S. did not avail herself to either of these options. Therefore, we do not find that the KPA violates the Equal Protection Clause as applied in this case.

*Vacating the Temporary Visitation Order*

The final issue raised by M.S. on appeal is whether the district court erred by vacating the agreed temporary visitation order prior to issuing its final ruling following the bench trial. In a journal entry entered on December 12, 2017, the district court ordered that M.S. be granted temporary visitation with the children "[p]ending a hearing on the . . . underlying Petition for Establishment of Parentage . . . ." After the district court heard the evidence presented at the two-day bench trial, it modified the temporary order and revoked M.S.'s visitation privileges.

In its decision, the district court stated:

"This order is in the best interest of the children. Certainty in the need for this order is compelled by the dichotomy [p]resented by the two alternatives, [one] of which will be a result. This court will either determine [M.S.] is not a parent or determine that she is and enter a parenting plan which the evidence suggests requires much more particularity than does the current generic visitation order. On balance it is in the boy[s'] best interest that until this court can reach a speedy decision parental access should and is hereby ordered to cease."

28

We first consider whether this issue is moot. An issue is moot if there is no longer a justiciable controversy between the parties. In order to have a justiciable controversy, the issue should involve an identifiable dispute between the parties with pending adverse legal interests that are immediate, real, and for which a court can provide conclusive relief. *In re A.E.S.*, 48 Kan. App. 2d 761, 764, 298 P.3d 386 (2013). As a matter of policy, we generally do not decide moot questions or issue advisory opinions. See *State v. McKnight*, 292 Kan. 776, 778, 257 P.3d 339 (2011).

The district court vacated its previous temporary visitation order on May 10, 2018. Twelve days later, the district court issued a final order denying M.S.'s petition. When the final order was issued, any objections to the temporary order became moot because any judicial action to modify the temporary order after that time would have been ineffectual and would have had no effect on either M.S.'s or E.L.'s rights. See K.S.A. 2018 Supp. 23-3212(g) (if a proceeding for determination of parentage is dismissed, any temporary parenting plan is vacated); *In re A.E.S.*, 48 Kan. App. 2d at 763. Thus, we conclude this issue is moot.

Nevertheless, we note that district courts are given broad discretion in modifying temporary orders. *In re Marriage of Osborn*, 35 Kan. App. 2d 853, 855, 135 P.3d 199 (2006) ("Kansas courts are vested with continuing jurisdiction to modify custody and visitation orders."). Here, the district court vacated its previous temporary visitation order after the completion of the bench trial. Not only was this action within the district court's authority, it was also consistent with the original journal entry that expressly stated that the temporary visitation was ordered "[p]ending a hearing on . . . the underlying Petition for Establishment of Parentage . . . ." Consequently, even if the issue was not moot, the district court acted within its discretion in modifying its temporary visitation order after the bench trial had been completed.

Affirmed.

29