IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 119,536

In the Matter of the Parentage of W.L. and G.L.,
By and Through M.S.,
*Appellant*,

and

E.L.,
*Appellee*.

SYLLABUS BY THE COURT

1.

The same-sex partner of a woman who conceives through artificial insemination may establish a legal fiction of biological parentage by asserting the Kansas Parentage Act (KPA) presumption of maternity in K.S.A. 2019 Supp. 23-2208(a)(4) by notoriously recognizing her maternity.

2.

A woman who seeks to establish parentage by using the presumption in K.S.A. 2019 Supp. 23-2208(a)(4) bears the initial burden to demonstrate the existence of the presumption. If she succeeds, the burden shifts to the party opposed to establishment of the mother and child relationship to rebut the presumption by clear and convincing evidence, by court decree establishing paternity or maternity of someone other than the presumed parent, or under K.S.A. 2019 Supp. 23-2208(c).

3.

K.S.A. 2019 Supp. 23-2208(c) provides that, if two conflicting parentage presumptions arise, "the presumption which on the facts is founded on the weightier considerations of policy and logic, including the best interests of the child" prevails.

4.

Under K.S.A. 2019 Supp. 23-2208(b), if a presumption under K.S.A. 2019 Supp. 23-2208(a)(4) is rebutted, the burden of going forward with evidence shifts back to the party seeking establishment of the parent and child relationship. That party must go forward with the evidence, and the ultimate burden can be discharged by a preponderance of the evidence.

5.

A woman seeking to establish parenthood who relies on the presumption of maternity under K.S.A. 2019 Supp. 23-2208(a)(4) need not show the existence of a written or oral coparenting agreement between her and the birth mother. She need only show she has notoriously recognized maternity and the rights and duties attendant to it at the time of the child's birth. In addition, in keeping with *Troxel v. Granville*, 530 U.S. 57, 66, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000), the court must ultimately be persuaded that the birth mother, at the time of the child's birth, consented to share her due process right to decision-making about her child's care, custody, and control with the woman who is claiming parentage under the KPA.

6.

Evidence in support of either party's position in a parentage action brought by a person seeking to establish a parent and child relationship by using the presumption in K.S.A. 2019 Supp. 23-2208(a)(4) may be direct or circumstantial, testimonial or documentary.

Review of the judgment of the Court of Appeals in 56 Kan. App. 2d 958, 441 P.3d 495 (2019). Appeal from Crawford District Court; RICHARD M. SMITH, judge. Opinion filed November 6, 2020. Judgment of the Court of Appeals affirming the district court is reversed. Judgment of the district court is reversed and the case is remanded with directions.

*Valerie L. Moore*, of The Law Offices of Valerie L. Moore, of Lenexa, argued the cause, and was on the briefs for appellant.

*Adam M. Hall*, of Thompson Warner, P.A., of Lawrence, argued the cause, and *Sarah E. Warner*, of the same firm, was with him on the brief for appellee.

*Gillian Chadwick*, director, Washburn Law Clinic, and *Heather Wedel* and *Jason Mewhirter*, legal interns, Washburn Law Clinic, of Topeka, were on the brief for amicus curiae Washburn University School of Law Children and Family Law Center.

The opinion of the court was delivered by

BEIER, J.: This case and *In re M.F.*, 312 Kan. __ (No. 117,301, this day decided), address whether the same-sex romantic partner of a woman who conceives through artificial insemination and gives birth during the couple's relationship can be recognized as a legal parent under the Kansas Parentage Act (KPA), even if the couple has not entered into a written or oral coparenting agreement.

In the district court, the judge ruled that the partner had no parental rights. A panel of our Court of Appeals affirmed that result. *In re W.L.*, 56 Kan. App. 2d 958, 441 P.3d 495 (2019). We accepted the partner's petition for review.

We rule that such a partner can be recognized as a legal parent through use of K.S.A. 2019 Supp. 23-2208(a)(4) when the birth mother has consented to shared parenting at the time of the child's birth. We therefore reverse the district court's judgment and the panel decision affirming it; we remand to the district court for further proceedings consistent with this opinion.

FACTUAL AND PROCEDURAL BACKGROUND

E.L. and M.S. began a same-sex romantic relationship in January 2012 and began living together shortly thereafter. The two began talking about children early, and both expressed a desire to be mothers at some point. In October 2012, E.L. paid for a membership at a sperm bank. And, the next month, she purchased eight vials from a donor through the bank. On E.L.'s third attempt at artificial insemination, in May 2014, she became pregnant.

During the pregnancy, announcements and a baby shower and social media posts appeared to treat both women as expectant mothers. E.L. would eventually testify that, to the extent these communications and behaviors could be construed to mean she was treating M.S. as a parent, she was merely attempting to include M.S. and expressing a hope that M.S. would eventually step into a parental role.

In December 2014, E.L. gave birth to twin boys, W.L. and G.L. E.L. listed herself as mother on the birth certificates. M.S. was not listed as a parent on the certificates, but the twins' last names were hyphenates composed of E.L.'s and M.S.'s last names. E.L. would testify that she used M.S.'s name to create the twins' last name to make M.S. feel included; she would later unilaterally drop M.S. from the babies' names.

E.L. and M.S. had not entered into a written coparenting agreement at the time of the twins' birth and never did.

The couple remained together after the twins' births for about nine months. The relationship ended after M.S. had a liaison with the boyfriend of E.L.'s sister, but the couple continued to reside together until January 2016. At that time E.L. moved with the twins from the couple's shared home in Kansas City to her parents' home in Pittsburg.

Not long after, M.S. moved in with her parents, who also lived in Pittsburg. E.L. allowed M.S. to keep the twins every other weekend and, eventually, one night during the week.

Once in Pittsburg, both E.L. and M.S. began new long-term relationships with others.

In September 2017, M.S. was considering moving back to Kansas City, believing E.L. would not live permanently in Pittsburg. Through a series of text messages, M.S. arranged to meet with E.L. so that they could discuss M.S.'s role in the twins' lives. At the meeting, M.S. asked E.L. about obtaining legal recognition as a guardian or parent. E.L. rejected M.S.'s request.

In early October 2017, M.S. filed a "Petition for Determination of Parentage" in Crawford County District Court. The petition alleged that M.S. had stood in the role of a parent, along with E.L., since the twins' conception, and that "it would be in the best interest of the minor children that the Court make a determination of parentage, custody, and child support." E.L.'s answer denied that M.S. was a parent of the children.

Late the next month a senior district court judge appointed a guardian ad litem to represent the twins and to offer an opinion on whether it was in their best interests to establish parentage of M.S. The same day, the judge entered a temporary visitation order. E.L. had cut off M.S.'s visitation after the petition was filed.

E.L. married C.H. in January 2018, having lived with her and the twins for several months beforehand.

The guardian ad litem filed her report in early February 2018, including the following:  E.L. had encouraged a relationship between the twins and M.S., but the

5

strength of the relationship was disputed. "It is clear that [E.L.] has performed the role of mother and had inconsistent involvement and support from [M.S.]." M.S. wanted to continue visits with the twins and provided them affection, but it appeared she had not been involved in making major decisions for the children and did not initiate any legal action until 22 months after the couple's separation. M.S. paid for some medical care, shared day care costs for a time, and provided clothes, toys, and diapers for the twins while they were in her care. M.S. and E.L. had been able to maintain an amicable relationship until M.S.'s filing of the parentage action. Since then, the parties continued to communicate in a businesslike manner. The twins would be "well cared for" by E.L. if M.S. is not declared the children's legal mother; E.L. had "primarily cared for them all along."

The guardian ad litem ultimately concluded:

"There is nothing in writing and no evidence that the parties had agreed on sharing custody of the children. [E.L.] did not agree to share custody with [M.S.].

. . . .

"[M.S.] was in favor of [E.L.]'s pregnancy. She was excited for the birth of the children. She has spent time with them and cares for them, but she has not assumed the role of a mother. She has not established her own housing for the children. She has discussed moving to Kansas City with her girlfriend[—]far away from the children. She has not provided financial support to the children while they are in the care of [E.L.]. It would not be in the best interests of the children to determine maternity and establish [M.S.] as their legal mother."

In late April 2018, the district judge heard two days of testimony.

M.S., M.S.'s parents, and M.S.'s current girlfriend testified for M.S. E.L., two of the boys' nannies, E.L.'s mother, and E.L.'s wife testified on E.L.'s behalf.

6

M.S. testified that she and E.L. made a joint decision to have children and to both be parents to them. M.S. said she had taken an active parenting role in the children's lives while she and E.L. were together and continued to do so after the separation by taking care of the children every other weekend. M.S. provided financial records of her expenses related to raising the boys, and she said she had been consulted about various parenting decisions. She conceded, however, that E.L. made the final decisions. It was undisputed that M.S. had been charged with driving while intoxicated after the children were born; she also admitted that alcohol consumption contributed to her "bad decision" to engage in the liaison that led to the couple's breakup.

E.L. testified that, although both she and M.S. discussed having children, she ultimately made the decision to get pregnant. After learning of the pregnancy, E.L. said, her life immediately focused on raising the children. M.S., on the other hand, continued her very active social life, including going to bars and clubs with friends. The night before the twins were born, for example, M.S. attended a party with friends. E.L. admitted she had encouraged M.S. to go to the party but did not expect M.S. would actually do so. E.L. also acknowledged that M.S. paid for half of day care expenses for the children, even after the couple split. But she said she had always told M.S. the payments were appreciated but not obligatory. E.L. said she alone did the research necessary to make decisions about the children and did not typically discuss these matters with M.S. E.L. said she often consulted the children's nanny for advice rather than seeking M.S.'s input.

During closing arguments, the guardian ad litem reiterated her opinion that a determination of M.S.'s maternity was not in the children's best interests. "I don't think that the evidence supports the conclusion that she's asking the Court to make. I'm not sure that the law supports that relief that she's seeking." The guardian ad litem understood that M.S.

7

"has a relationship with the children, that she has paid for things for the children, and a substantial amount of things.

"But it doesn't appear to me that she ever took on a mother role in the same way that [E.L.] did. [E.L.] has made the major decisions. She has been the primary caregiver and done the things that a—that a mother would do. It doesn't seem to me that [M.S.] has shared in the hard parts of being a parent in the same way that [E.L.] has and that [M.S.] has not changed her life the way a parent would and assumed that role."

The closing argument from M.S.'s counsel framed the issues before the district judge in language mostly echoing K.S.A. 2019 Supp. 23-2208(a) and (b), provisions in the KPA. Counsel said that, first, the judge must decide whether M.S. established a presumption of parentage by a preponderance of the evidence; then, whether E.L. had rebutted the presumption by clear and convincing evidence; and, finally, whether M.S. had nonetheless carried her burden of going forward with clear and convincing evidence. Counsel relied on evidence that M.S. had been present at E.L.'s obstetrics appointments and ultrasound examinations, that she had participated in the baby shower, and that she had been present at the birth. She also emphasized that M.S. had been shown as one of the babies' mothers on pregnancy and shower announcements and had provided an "extreme amount" of financial support to cover medical and day care expenses. Counsel argued that M.S. had met her statutory burden to show she had "notoriously" acknowledged parenthood. In her view, E.L. presented "zero evidence" that M.S. was not a parent before events that immediately proceeded M.S.'s filing of her petition.

E.L.'s counsel argued in closing that M.S. never stepped into the role of a parent, saying: "Her lifestyle didn't change after she learned of the pregnancy, nor did it change after the babies were born." Counsel minimized the strength of M.S.'s evidence:

"If the situations were reversed, if [E.L.] had filed an action to come here and say 'hey, I want to establish maternity. [M.S.], you are going to start paying me child support, I'm going to determine you to be a mother[,'] this probably would have been kicked out on a motion to dismiss for failure to state a cause of action."

The district judge issued a Decision and Order Denying Parentage of M.S. on May 22, 2018. He said that he found E.L.'s testimony "more believable, credible, and worthy of weight than the testimony of [M.S.], particularly where the [two] were in conflict," and he outlined the same KPA shifting evidentiary burdens that had been articulated during the closing argument of M.S.'s counsel. Like M.S.'s counsel, the judge described M.S.'s ultimate burden as demanding clear and convincing evidence.

Despite this nod to the KPA, the judge stated that the Act's framework was not tailored to the situation before him and thus turned to caselaw, adopting as the governing legal rubric a de facto parenthood test from Wisconsin. See *In re Custody of H.S.H.-K.*, 193 Wis. 2d 649, 658, 533 N.W.2d 419 (1995).

"Based upon the evidence in this case the court finds that one way [a] presumption [of parentage] may be rebutted is if the biological or adoptive parent can demonstrate, by clear and convincing evidence, that the putative parent has never met the criteria for a functional, psychologic, or de facto parent. Presuming a well-reasoned definition and parenthood test which sets forth the appropriate factors of a functional or de facto parent failure to demonstrate at least minimal qualifications would generally indicate the lack of a relationship worthy of legal sanction.

. . . .

"'[T]o demonstrate [the] existence of the petitioner's parent-like relationship with the child, the petitioner must prove four elements:  (1) that the biological or adoptive parent consented to, and fostered, the petitioner's formation and establishment of a parent-like relationship with the child; (2) that the petitioner and the child lived together

9

in the same household; (3) that the petitioner assumed the obligations of parenthood by taking significant responsibility for the child's care, education and development, including contributing towards the child's support, without expectation of financial compensation [a petitioner's contribution to a child's support need not be monetary]; and (4) that the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship parental in nature.'"

Applying the Wisconsin test to the evidence before him, the judge wrote:

"The evidence is more indicative of petitioner being a ride along than an active participant in the determination to form a parent-child relationship. In evaluating her 'acknowledgment' if we are forced to use that term as it appears in K.S.A. [23-2208(a)(4)] there are 3 significant actions which one might construe as true participation as a parent. One is her financial contributions which are uncontroverted and speak for themselves.

"The 2nd is the fact that she moved to Pittsburg[], after the respondent relocated, in what she described as a move made following 'her children.' Frankly the court is very skeptical that this is the entire motivation. The events that precipitated the destruction of the relationship between the petitioner and the respondent and the probable social and or emotional ramifications just as easily might have made the petitioner's parents' home a safe harbor in what was certainly a typhoon of personal destruction.

"Finally, there is the fact that the children did spend 'visitation' time at petitioner's parents' home while petitioner was most probably present at least a majority of the time. The court finds most credible the testimony of the respondent suggesting that she only felt the children were safe there because of the petitioner's parents with whom the respondent apparently had a relatively close relationship. The degree to which this is more appropriately classified 'grand-parent visitation' than 'parental access' is an implicit question raised by the evidence and reasonable inferences from the GAL recommendation. Particularly telling is the concern expressed by the respondent upon learning that the petitioner had taken the children outside of the state of Kansas. The restrictions the respondent would have at least preferred is more indicative she considered the petitioner something far less than a parent. In the days preceding the filing of this

action the overall landscape that must have been obvious to the petitioner is equally obvious to the court. The respondent is now married. From the evidence the respondent's wife is functioning as a parent, more so than the petitioner despite the significant disparity in the amount of time respondent[']s new partner has spent with the children. Petitioner cannot make a credible claim that she was prevented from being a parent, especially earlier [in] the relationship, because of the responsibility she is allowing [respondent's] wife to assume. With the understanding of the respondent and her wife intend to relocate the petitioner initiates contact with the respondent regarding her plans for the future. The respondent's immediate response is most indicative of her intent and attitude throughout the relationship. She felt obligated to clarify to the petitioner that she was not considered a parent. Undoubtedly, it is the unspoken trajectory of the respondent and her wife to have their family unit solidified through a probable step parent adoption proceeding. Although this might operate as a motive to shade or color her testimony in a more favorable light the court is convinced that respondent remains the most credible source of evidence when it comes to the parties' intent and their interactions. Only when it became apparent, after 3 years of opportunity, that the petitioner and her parents might be deprived contact with the children was this action filed.

"Credible evidence potentially establishing a parentage presumption is the fact that the respondent originally, unilaterally, listed the children's names with a hyphenated version of both the petitioner and respondent's last names on the birth certificate. . . . [T]his action has since been undone. The testimony of the respondent is that this act along with several other acts which might be construed as a mutual intent to parent were all done in a futile attempt to hold out until the petitioner made a sincere commitment toward both the then existing family unit and parentage. Before the petitioner ever came into that state of mind the respondent came to realize the futility of the hopes that she placed in the petitioner."

The judge then explained his ruling, using the Wisconsin test to measure whether E.L. had rebutted by clear and convincing evidence any KPA presumption that may have arisen in favor of M.S.

11

"If the petitioner has established by a preponderance of the evidence a presumption under the Kansas parentage act the respondent has convinced the court by clear and convincing evidence that the petitioner fails to meet the requisite criteria of a psychological, de facto, or functional parent. In making this determination the court has looked closely at the 4 factors set out in *Custody of H.S.H.-K*. The period where the petitioner appeared significantly and sincerely involved in a material and substantial fashion was during the period in which she enjoyed parental access only because the court directed the parties to allow for temporary visitation while the action was pending. It is inequitable to allow that period to control the court's decision or have any major influence upon the court in determining if the petitioner functioned[, o]verall, as a de facto parent.

"As concerns the 'consent' of the biological parent, the court is convinced that there was a time in which the respondent truly hoped that the petitioner would focus her attention on the family unit and act in a fashion expected of one who truly intends to assume the responsibilities of being a parent. The fact that the parties never married when that was available in other states, the fact that they didn't marry when that was available in Kansas, the fact that although they purchased rings they were never picked up from the jeweler, the fact that there were never any written instruments regarding artificial insemination or parenting responsibilities, and the other evidence described above all indicate to this court that there was never really a 'meeting of the minds' so to speak regarding parentage.

"Finally, the court notes that there is evidence to suggest that a parental figure is in a position of psychological bonding with the children. That is the respondent's current wife. The court is not making this decision based on which is the better parent or potential parent. It is important to note that there is evidence that the respondent has presented which suggests this bonding has taken place between the children and her wife. This establishes the children are of an age where they are subject to emotional injury if their relationship with a 'psychological parent' is being severed. It also establishes that if there is some indication that if there was a bonded and substantial relationship of a parental nature between the petitioner and the respondent evidence of the same could have been presented to the court and it should have been apparent to the Guardian ad litem. Other than the self-serving testimony of the petitioner there is no evidence of such

12

bonding and the credible evidence suggests that it is more detrimental for the children to visit with the petitioner than to not.

"The petitioner has not overcome the respondent[']s clear and convincing evidence rebutting any statutory presumption. In addition to these findings the court makes this specific finding that it appears by clear and convincing evidence that it is not in the children's best interests to establish a parent-child relationship between the petitioner and the children. . . .

"The petition for parentage is therefore denied."

M.S. appealed to our Court of Appeals, raising four challenges: (1) the district judge erred by ruling M.S. did not meet her burden to show she was a parent; (2) the district judge erred by using "best interests" as the standard for determination of parentage; (3) E.L. failed to present sufficient evidence to rebut M.S.'s presumption of parentage; and (4) the district judge's consideration of and reliance upon the parties' lack of marriage, lack of coparenting agreement, and M.S.'s personal relationships and actions violated equal protection.

In response, E.L. argued that the district judge correctly applied the shifting burdens provided in the KPA and did not err by insisting that M.S.'s acknowledgment of parenthood under K.S.A. 2019 Supp. 23-2208(a)(4) meets the test for a "psychological, de facto, or functional parent" under Wisconsin caselaw. In E.L.'s view, the district court judge was entitled to make credibility assessments and substantial evidence supported the judge's factual findings and, in turn, his conclusions. She also argued that M.S. could not contest the guardian ad litem's conclusions on the twins' best interests or attempt to limit the relevance of those conclusions, because M.S. had been in favor of the guardian's appointment in the first place. E.L. saw no equal protection violation in what she asserted was the KPA's distinction between those with a biological connection to a child and those

without it; the two groups do not qualify as similarly situated, the first step in equal protection analysis.

The Court of Appeals panel affirmed the district judge's decision. The panel set out the shifting evidentiary burdens under the KPA, correctly stating that, if M.S.'s presumption was rebutted by E.L., "the burden of proof shifts back to [M.S.] to go forward with the evidence." *In re W.L.*, 56 Kan. App. 2d at 969 (citing K.S.A. 2018 Supp. 23-2208[b]; *Kline v. Holmes*, No. 118,067, 2018 WL 1659927, at *5-7 [Kan. App. 2018] [unpublished opinion]). It noted that the district judge's findings of fact were to be reviewed by substantial competent evidence while his conclusions of law would be reviewed de novo. 56 Kan. App. 2d at 969-70.

The panel criticized the district judge for failing to reach a firm conclusion on whether M.S. carried her initial burden to demonstrate the existence of a presumption of parentage under K.S.A. 2019 Supp. 23-2208(a)(4). But it held that any error would be harmless because the judge assumed for the sake of argument that M.S. met that standard and then properly moved to the next question under the statute:  Did E.L. rebut that presumption by clear and convincing evidence? 56 Kan. App. 2d at 971; see K.S.A. 2019 Supp. 23-2208(b).

On this question, the panel observed first that E.L., as the twins' biological mother, had a fundamental constitutional right to raise her children. *In re W.L.*, 56 Kan. App. 2d at 972 (citing *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 [2000]). Without a written coparenting agreement or, at a minimum, a written waiver of E.L.'s constitutional rights, the panel held that E.L. had met her burden to overcome the presumption in favor of M.S. The panel predicted that this court would not be willing to recognize an oral agreement to coparent as binding when one same-sex partner was the birth mother of a child conceived through artificial insemination and the other had no actual biological or adoptive relationship to the child. 56 Kan. App. 2d at 974-75.

14

Alternatively, the panel held, even if no written coparenting agreement would be required to make M.S. a parent, the district judge's decision that E.L. successfully rebutted M.S.'s presumption under K.S.A. 2019 Supp. 23-2208(a)(4) by showing she had not waived her *Troxel* rights and agreed to shared parenting of the twins with M.S. was a pure finding of fact supported by substantial competent evidence. 56 Kan. App. 2d at 976. The panel noted that some evidence was undisputed: The parties never married; M.S. never attempted to adopt the twins; and she never inquired about being the twins' guardian until nearly three years after they were born. Then, viewing the rest of the evidence in the light most favorable to E.L., and giving her the benefit of the district judge's explicit credibility judgment in her favor, the panel stated:

"In addition to the undisputed evidence in the record, there is substantial evidence upon which a reasonable person could find that M.S.'s involvement with the children was primarily incidental rather than sharing in the responsibilities of parenting. As the district court recognized, there was 'a time in which [E.L.] truly hoped that [M.S.] would focus her attention on the family unit and act in a fashion expected of one who truly intends to assume the responsibilities of being a parent.' However, after hearing all the evidence, the district court concluded that E.L.'s hopes remained unfulfilled. We find this to be a reasonable inference from the evidence presented.

"Ultimately, the district court found the testimony of E.L. to be more credible than that of M.S., and we cannot replace our judgment for that of the district court regarding questions of fact. Based on our review of the record in a light most favorable to the prevailing party below, we conclude that substantial competent evidence supports the district court's factual findings and that the inferences drawn from the evidence by the district court were reasonable. We also conclude that there is substantial competent evidence in the record to support the district court's finding that E.L. rebutted M.S.'s presumption of parentage by clear and convincing evidence. Lastly, we conclude that the district court's determination that M.S. was unable to overcome E.L.'s clear and convincing evidence regarding parentage is supported by substantial competent evidence in the record." 56 Kan. App. 2d at 976.

15

The panel also agreed with E.L. that M.S. could not challenge the district judge's consideration of the twins' best interests because M.S. had sought the appointment of the guardian ad litem. That said, the panel nevertheless voiced an opinion on the merits of whether best interests could ever be a factor in a parentage action such as this. It held that such consideration in any case affecting a parent and child relationship would not qualify as error. Even if not strictly necessary under the KPA, it would be consistent with Kansas law's general emphasis on child welfare. 56 Kan. App. 2d at 977-78.

Finally, the panel also followed E.L.'s lead on M.S.'s equal protection challenge, holding that M.S. could not show that she was similarly situated to a person with an actual biological or adoptive connection to a child. This KPA distinction between her and such a person is, the panel said, "not based on marital status, sexual orientation, or gender" and did not violate equal protection. 56 Kan. App. 2d at 979-80.

M.S. filed a petition for review to this court of two issues: Whether the panel erred by requiring M.S. to have a written agreement to establish parentage, and whether the panel erred by "finding that the lack of a written co-parenting agreement is more significant than the actions of a biological mother acknowledging that her partner is a parent of her children and acting in accordance with that acknowledgement?"

This court granted review, and both parties filed supplemental briefs.

M.S.'s supplemental brief opened by restating her issues.

"Issue I: Did the Court of Appeals err in finding that the [Assisted] Reproductive Technology (ART) statutes apply to non-married partners?

"Issue II: Is the Court of Appeal[s'] requirement of a written agreement to co-parent

16

between non-married partners raising children an incorrect interpretation of the KPA and of case law?

"Issue III: Is the Court's use of 'best interests' as the legal standard to rebut a presumption of parentage when there are no other putative parents an improper analysis of the KPA and case law?

"Issue IV: Did the Court of Appeal[s] err in finding that the lack of a written co-parenting agreement is more significant than the actions of a biological mother acknowledging that her partner is a parent of her children and acting in accordance with that acknowledgement, when the parentage act makes no such requirement?

"Issue V: Does the Court of Appeals' application of the KPA in this case violate M.S.'s Fourteenth Amendment right to equal protection under the law?"

E.L.'s supplemental brief argued that the first, third, and fifth issues set out in M.S.'s supplemental brief were "new issues not presented or fairly included in her Petition for Review." But E.L. did not challenge M.S.'s apparent belief that the Court of Appeals panel had ruled that the KPA required a written coparenting agreement or a written waiver of E.L.'s *Troxel* rights. Instead, she argued that such a requirement was in keeping with other Kansas statutes and state and federal caselaw. E.L. also argued that the KPA would recognize only a biological or adoptive parent-child relationship, treating the presumptions under K.S.A. 2019 Supp. 23-2208(a) as tools to ferret out an actual biological link rather than legislative authorization to employ legal fictions satisfying a requirement of biological parenthood. She argued that this court's decision in *Frazier v. Goudschaal*, 296 Kan. 730, 295 P.3d 542 (2013), should not be read to permit a woman in M.S.'s position to take advantage of "notorious acknowledgment," the presumption in K.S.A. 2019 Supp. 23-2208(a)(4); and, even if it were so read, the presumption should be rebutted "automatically" when there is no actual biological or adoptive link. In E.L.'s view, "The presumption in K.S.A. 23-2208(a)(4) cannot be 'practicabl[y]' applied to M.S.

17

because it would have been impracticable for E.L. and M.S. to naturally conceive the child[ren] and both be the children's biological mothers."

E.L.'s supplemental brief also reiterated her Court of Appeals argument, accepted by the panel, that M.S. could not complain about the district judge's consideration of the twins' best interests, given M.S.'s request for appointment of the guardian ad litem. She also agreed with the panel that the district judge committed no error by considering best interests and took the position one step farther. She asserted that the consideration of the twins' best interests was imperative—given the district judge's finding that M.S. was never a psychological, de facto, or functioning parent of the children and that E.L.'s current wife was. Repeating a statement her counsel had mentioned in passing in the district court, E.L. said this factual scenario raised the possibility of competing presumptions under K.S.A. 2019 Supp. 23-2208(c), which reinforced the district judge's decision that E.L. had rebutted the presumption invoked by M.S.

On the merits of M.S.'s equal protection claim, E.L. insisted that M.S. was being treated no differently than any unmarried heterosexual partner of E.L. would be treated under the KPA.

At oral argument before this court, counsel for M.S. argued in essence that the district judge lost sight of the requirements of K.S.A. 2019 Supp. 23-2208(a)(4). The district judge, in particular, erred by permitting E.L. to admit irrelevant evidence related to whether M.S. was a good parent to the twins or a good partner to E.L., rather than whether she had notoriously recognized her maternity, the only question spurred by the statute. Then the district judge erred by relying on the same kind of evidence and absence of a written coparenting agreement to rule that E.L. had rebutted M.S.'s presumptive parenthood. The district judge's demand that M.S. meet the Wisconsin de facto parenting test, demonstrate E.L.'s consent to shared parenting, and prove that a declaration of her own parentage was in the best interests of the twins compounded his initial

18

misinterpretation and misapplication of the presumption statute. The Court of Appeals panel, in counsel's view, erred by failing to correct the district judge's multiple mistakes.

Counsel for E.L. argued to this court that the district judge correctly based his decision on the absence of a coparenting agreement between the parties, E.L.'s decision to give her parents rather than M.S. backup legal responsibility for decision-making for the twins, M.S.'s failure to meet the Wisconsin de facto parent test, and E.L.'s spouse's assumption of parenting duties. When challenged to identify how that list compared to the KPA's language, counsel suggested the Act permitted the presumptions to operate only to recognize a pre-existing, actual biological link between parent and child. Without such a link, a person in M.S.'s position must show that the biological parent entered into a written coparenting agreement with him or her, as the couple had in *Frazier*. Without such an agreement, he argued, the biological parent's constitutionally protected right to care, custody, and control of his or her children would be violated.

DISCUSSION

We address preservation first.

This case is similar to *In re M.F.* because the partner of the birth mother has had some variation in her phrasing of the issues before the district court, the Court of Appeals, and this court. Nevertheless, we are satisfied that the two challenges in the petition for review before us, her second and fourth issues in her supplemental brief, her first three challenges before the Court of Appeals, and her arguments in the district court have been sufficient to preserve the controlling legal question we must answer: Did the district judge and the Court of Appeals apply the wrong legal standards in evaluating the evidence before them on the K.S.A. 2019 Supp. 23-2208(a)(4) presumption of maternity M.S. had claimed and any other governing law? We therefore move to the merits of that question.

19

In today's *In re M.F.* decision, 312 Kan. __, Syl. ¶ 1, we hold that the same-sex partner of a woman who conceives through artificial insemination may establish a legal fiction of biological parentage by asserting the KPA presumption of maternity in K.S.A. 2019 Supp. 23-2208(a)(4) (notorious recognition of maternity). See K.S.A. 2019 Supp. 23-2220 (KPA provisions applicable to father and child relationship apply, insofar as practicable, to determine existence of mother and child relationship.). She bears the burden to demonstrate the initial presumption. If she succeeds, the burden shifts to the party opposed to establishment of the relationship to rebut the presumption by clear and convincing evidence, by court decree establishing paternity or maternity of someone other than the presumed parent, or under K.S.A. 2019 Supp. 23-2208(c). Subsection (c) provides that, if two conflicting presumptions arise, "the presumption which on the facts is founded on the weightier considerations of policy and logic, including the best interests of the child" prevails. If a presumption is rebutted, the burden shifts back to the party seeking establishment of the parent and child relationship, who must go forward with the evidence. K.S.A. 2019 Supp. 23-2208(b). The ultimate burden placed on the party seeking court recognition of the relationship can be discharged by a preponderance of the evidence. See *In re M.F.*, 312 Kan. __, Syl. ¶ 4.

Today's *In re M.F.* decision also makes clear that it is not necessary that a written or oral coparenting agreement exist for a woman in M.S.'s position to establish an initial presumption of maternity under K.S.A. 2019 Supp. 23-2208(a)(4) or to prevail on her ultimate burden of proof. She need only show she has notoriously recognized maternity and the rights and duties attendant to it at the time of the child's birth. In addition, in keeping with *Troxel v. Granville*, 530 U.S. 57, 66, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000), the court must ultimately be persuaded that the birth mother, at the time of the child's birth, consented to share her due process right to decision-making about her child's care, custody, and control with the woman who is claiming parentage under the KPA.

Evidence in support of either party's position may be direct or circumstantial, testimonial or documentary.

Under *In re M.F.*, we must reverse the district court's judgment in this case.

Although the district judge appreciated the burden-shifting design of K.S.A. 2019 Supp. 23-2208(a), (b), and (c), he did not explicitly apply each step of it in the manner that *In re M.F.* has now outlined and we require. He also incorrectly recited that the ultimate burden of a person seeking to establish a parent and child relationship under the KPA—that of "going forward with the evidence"—must be borne by clear and convincing evidence. In fact, this burden calls on the party to go forward with evidence sufficient to prove the relationship only by a preponderance of the evidence.

The district judge also erred in demanding a "meeting of the minds" or at least an oral coparenting agreement between the parties, rather than a combination of M.S.'s notorious acknowledgement of maternity and E.L.'s consent to share her *Troxel* parenting rights as of the time of the twins' birth. He applied a Wisconsin test for de facto parenting rather than remaining focused on the actual KPA question before him.

The district judge also apparently relied heavily on evidence critical of M.S.'s performance as a partner and a parent after the twins' birth. As we make clear in *In re M.F.*, the quality of her partnering with E.L. was not necessarily material to the statutory and constitutional questions a district judge must answer. Treating this sort of evidence as functionally dispositive was error. It may be, however, that the quality of the parenting of a woman in M.S.'s position can be circumstantially relevant to what she understood about the meaning of her K.S.A. 2019 Supp. 23-2208(a)(4) acknowledgment of maternity at the time of a child's birth. As K.S.A. 2019 Supp. 23-2205 states, a parent and child relationship means "the legal relationship . . . incident to which the law confers or imposes rights, privileges, duties and obligations." An acknowledgment of maternity with

no appreciation of the benefits and burdens it distributes can be legally significant, just as one with such an appreciation can be legally significant. We stress that this is not the same thing as allowing a birth mother in E.L.'s position veto power over a partner's parentage pre-existing maternity after a child's birth.

This point bears emphasis on the record in this particular case, because of E.L.'s repeated statements about her attitude toward M.S.'s parentage shifting over time. She repeatedly expressed her hope—apparently both before and after birth—that M.S. would "step up." *In re M.F.* makes clear that a birth parent needs to make a decision and be held to it, not given the power to change his or her mind whenever the bloom is off the rose of romance or it otherwise suits. A child is born with one legal parent or two. His or her birth mother does not get to change that reality once it arises by operation of law.

We also must comment on the influence E.L.'s later marriage and the helpfulness of her current wife appears to have played in the district court's judgment. Our reading of the record before us leads us to believe that E.L.'s counsel never truly pursued the possibility that this case may involve competing presumptions under K.S.A. 2019 Supp. 23-2208(c). See *State v. Godfrey*, 301 Kan. 1041, 1043-44, 350 P.3d 1068 (2015) (Supreme Court Rule 6.02[a][5] [2020 Kan. S. Ct. R. 34] requires explanation why issue not raised below is nonetheless properly before court on appeal); see also *State v. Boysaw*, 309 Kan. 526, 542-43, 439 P.3d 909 (2019) (argument deemed waived, abandoned for failure to brief issue). Yet the district judge relied in part on what he believed to be the current wife's positive impact on the twins' lives. We applaud the district judge's compassion on this point; no member of this court wishes anything less for these boys as a function of their birth mother's current relationship. But, unless E.L. is trying to establish a competing presumption in favor of her wife's maternity under K.S.A. 2019 Supp. 23-2208(c), her wife and her relationship to the twins is irrelevant to whether M.S. can establish her pre-existing maternity under K.S.A. 2019 Supp. 23-2208(a)(4) and (b).

Like the district court, our Court of Appeals panel focused erroneously on the parties' lack of an oral or written coparenting agreement, on the absence of a full waiver of E.L.'s *Troxel* parenting right rather than a consent to share it at the time of the twins' birth, and the district judge's factual findings on the deficiencies in M.S.'s parenting performance. It thus reinforced rather than corrected the several legal deficiencies in the district judge's judgment. Thus its decision must also be reversed.

This case must be remanded to the district court for further proceedings consistent with the rules laid out today in *In re M.F.*, 312 Kan. __ (No. 117,301, this day decided), and the criticisms outlined above.

As a final note, to the extent the parties have asked us to consider independent arguments based on the merits of their equal protection and best interests arguments, we do not reach those issues today. It is unnecessary to do so for us to dispose of this case at this stage.

CONCLUSION

We reverse the judgment of the district court and the decision of the Court of Appeals affirming that judgment.

We remand to the district court for further proceedings consistent with this opinion. As in *In re M.F.*, on remand, the district judge will be free to allow submission of additional evidence by the parties if he deems such evidence necessary to conduct the legal analysis we have outlined. This evidence may extend to proof of the existence or nonexistence of competing presumptions.

23

HENRY W. GREEN, JR., J., assigned.[1]

STEVE LEBEN, J., assigned.[2]

* * *

STEGALL, J., dissenting:  The lynchpin of the holdings in today's twin decisions in *In re M.F.*, 312 Kan. __ (No. 117,301, this day decided), and *In re W.L.*, 312 Kan. __ (No. 119,536, this day decided), is the majority's self-described "legal fiction" that a person can be a "biological parent" without sharing any parental DNA with the putative child. While this is certainly a fiction, it can hardly be described as a "legal" one. Indeed, under any accepted mode of statutory interpretation, the notion that the plain language of the Kansas Parentage Act means that a person not biologically related to a child can "become" a biological parent is untenable. I have demonstrated as much previously in *In re Adoption of T.M.M.H.*, 307 Kan. 902, 920-38, 416 P.3d 999 (2019) (Stegall, J., concurring and dissenting).

The majority rules that a person "may establish a legal fiction of biological parentage by asserting the Kansas Parentage Act (KPA) presumption of maternity in K.S.A. 2019 Supp. 23-2208(a)(4) by notoriously recognizing her maternity." 312 Kan.

---

[1] **REPORTER'S NOTE:**  Judge Green, of the Kansas Court of Appeals, was appointed to hear case No. 119,536 under the authority vested in the Supreme Court by K.S.A. 2019 Supp. 20-3002(c) to fill the vacancy on the court by the retirement of Justice Lee A. Johnson.

[2] **REPORTER'S NOTE:**  Judge Leben, of the Kansas Court of Appeals, was appointed to hear case No. 119,536 under the authority vested in the Supreme Court by K.S.A. 2019 Supp. 20-3002(c) to fill the vacancy of the court by the retirement of Chief Justice Lawton R. Nuss.

__, Syl. ¶ 1. As I explained in *T.M.M.H.*, the key to understanding the statutory scheme—and K.S.A. 2019 Supp. 23-2208(a)(4) in particular—is to understand the plain meaning of the words paternity, maternity, and recognize or acknowledge:

> "Paternity means something more specific than just generic fatherhood. As used in the KPA, it clearly means biological fatherhood. Paternity is the 'condition of being a father, esp. a biological one,' and maternity is the 'condition of being a mother, esp. a biological one.' Black's Law Dictionary 1125, 1306 (10th ed. 2014). An adoptive father does not take a paternity test to establish fatherhood—to do so would be both futile and nonsensical. Legal fatherhood is broader than mere paternity.

> "Furthermore, to acknowledge something means to recognize it 'as being factual.' Black's Law Dictionary 27 (10th ed. 2014). The act of acknowledgment [or recognition] does not make something true or real. To acknowledge something is merely to accept and recognize as true a preexisting reality. Thus, one cannot make oneself into a father by acknowledgment [or recognition]. A person who makes a voluntary acknowledgment of paternity is not akin to a person taking a citizenship oath—a noncitizen immediately beforehand and a citizen immediately afterward. Rather, a person acknowledging [or recognizing] paternity is a person who purportedly already is biologically related to a child and is merely availing himself of a presumption in favor of that preexisting condition. We explicitly made this point recently when we construed the meaning of "'acknowledgment of paternity'" to mean, citing Black's Law Dictionary, a "'father's public recognition of a child as his own.'" *State ex rel. Secretary of DCF v. Smith*, 306 Kan. 40, 49, 392 P.3d 68 (2017). One can only publicly recognize a fact that preexists the act of recognition. Recognition does not give birth to the fact." 307 Kan. at 929 (Stegall, J., concurring and dissenting).

Contrary to this plain meaning, the majority fashions a statutory scheme under which a biological relationship can be conjured—*ex nihilo*—by the power of an incantation. The legal rule at work here is little more than "saying it makes it so." And that is no rule at all. The majority tries to rally statutory support for its legal fiction of non-biological biology by pointing to the artificial insemination provisions of the KPA.

25

The majority suggest that those provisions "work together to create complementary fictions:  one that the husband of the woman undergoing the procedure is the actual biological father of the child produced, see K.S.A. 2019 Supp. 23-2302, and one that the sperm donor is not the actual biological father. See K.S.A. 2019 Supp. 23-2208(f)." *In re M.F.*, 312 Kan. at __, slip op. at 21.

But this, too, is incorrect. In fact,

"When parents in Kansas utilize ART in accordance with statutory guidelines, the nonbiological spouse who consents in writing to the procedure is automatically granted in law the rights and responsibilities of a parent-child relationship with the resulting child. That consent has the same effect 'as adoption papers.' K.S.A. 2016 Supp. 23-2303. And the child is given, by law, a status identical to 'a naturally conceived child of the [married couple].' K.S.A. 2016 Supp. 23-2302. Or as Professor Elrod put it in her amicus brief to this court in *Frazier*, the 'parent-child relationships resulting from ART are no different from those formed naturally or by adoption.' Presumably, though Kansas law speaks in terms of 'husband and wife,' the opportunity to avail themselves of a de facto adoption through ART is necessarily extended to same-sex married couples pursuant to the United States Supreme Court's ruling in *Obergefell v. Hodges*, 576 U.S. [644], 135 S. Ct. 2584, 192 L. Ed. 2d 609 (2015); see also *Marie v. Mosier*, 196 F. Supp. 3d 1202, 1221 (D. Kan. 2016) (relying on *Obergefell* to enjoin the executive branch of Kansas from 'treating same-sex married couples differently' than 'opposite-sex married couples' when determining 'the other rights, protections, obligations, or benefits of marriage')." 307 Kan. at 927-28 (Stegall, J., concurring and dissenting).

There is no fiction of biology created by the Assisted Reproductive Technology (ART) procedures. There is only a conferral of rights and responsibilities—of the legal status of parent and child. If anything, the ART provisions are merely an alternative form of adoption. This is why the KPA explicitly uses the legal rules governing adoptions to govern the consent required by the ART scheme. See K.S.A. 2019 Supp. 23-2303. It is why courts can refer to the parent child relationship between the non-biological parent of

26

a child produced by ART and the child as a "de facto adoption." *In re L.C.*, No. 120,072, 2020 WL 110866, at *6 (Kan. App. 2020) (unpublished opinion).

Once the majority has arrived at its "declared parentage" rule, the rest of the opinion is sheer policy making. How is this rule supposed to be applied? Certainly the statute doesn't tell us. What about the actual biological parents and what they want? What about the possibilities of fraud, or mere changes of whim? Does the magic that creates a biological parent out of nothing have to be set down in writing?

The majority recognizes these are vexing problems, and proceeds to do its best to provide workable answers. But of course solving these policy questions is not this court's job. See *State ex rel. Six v. Kansas Lottery*, 286 Kan. 557, 562, 186 P.3d 183 (2008) ("It is not the duty of this court to criticize the legislature or to substitute its view on economic or social policy; it is the duty of this court to safeguard the constitution."). My fear is that in the process, we have continued down the dangerous road we set out on in *Frazier*. Just as in *T.M.M.H.*, I believe today's majority simply believes "that the responsibility to care for children can be shared with people who are neither biological nor adoptive parents and the law ought to find a way to recognize this when it is in the best interests of the child." *In re Adoption of T.M.M.H.*, 307 Kan. at 937 (Stegall, J., concurring and dissenting). Unfortunately, the legal scheme we have created now permits the commodification of children:

> "This … is nothing short of a revolution in societal norms that have for centuries firmly rejected the commodification of children. Here I must be clear—the *Frazier* court and today's plurality is saying that in Kansas, the prevailing law dictates that a parent in relation to a child possesses a discreet, property-like thing called a 'parental preference' which is divisible and can be 'contracted' away to a third party, thus conferring on that third party an equal parental preference which transmogrifies the third party into another lawful parent of the child. What are the limiting principles governing these transactions? We do not know." 307 Kan. at 937 (Stegall, J., concurring and dissenting).

27

Today, we go even a step further and suggest that the third party's legal status as a parent can be brought into existence by the mere declaration of that third party, and such a declaration will be enforced even against a biological parent's rights by the mere showing of "implicit . . . proof by . . . circumstantial evidence . . . [of] an intent to share." *In re M.F.*, 312 Kan. at __, slip op. at 38-39. But children are not cookies, and sharing is far too elusive a concept on which to establish such bedrock relationships as those which exist between parents and their children.

As I wrote in *T.M.M.H.*,

"Long ago, Justice Brewer, writing for this court, articulated the fundamental manner in which the parent-child relationship is rooted in the 'law of nature.' *Chapsky v. Wood*, 26 Kan. 650, 652 (1881). As such, the positive law protects what we have come to call the 'parental preference' which is described as 'a fundamental right . . . to the care, custody and control of [the parent's] child.' . . . (quoting *Sheppard v. Sheppard*, 230 Kan. 146, 154, 630 P.2d 1121 [1981]). Justice Brewer recognized, however, that this parental preference 'is not like the right of property' which would render 'a child . . . like a horse or any other chattel, subject-matter for . . . gift or contract.' *Chapsky*, 26 Kan. at 652-53." 307 Kan. at 936 (Stegall, J., concurring and dissenting).

We have abandoned these sound principles at great risk to vulnerable children across our state.

As a final observation, I am struck by the fact that while I have made clear my disagreement with the majority's consistent interpretation of the KPA—in *Frazier*, *T.M.M.H.*, and in today's cases—the Legislature has said nothing. It is true that legislative silence is a weak indicator of correct judicial interpretations. *State v. Hambright*, 310 Kan. 408, 419, 447 P.3d 972 (2019) ("'Legislative inaction may not be the strongest indicator of specific legislative purpose, but it is *an* indicator [Citations omitted].'").

Nonetheless, legislative silence is a practical acquiescence if not a legal one. If the legislative branch does not agree with this court's interpretation of the KPA, it has a constitutional obligation to act. Otherwise, the carefully balanced separation of powers intended by our constitutional structure cannot properly function. *Sierra Club v. Mosier*, 305 Kan. 1090, Syl. ¶ 8, 391 P.3d 667 (2017) ("Under the separation of powers doctrine, determination of appropriate policy must be left to the legislative and executive branches of Kansas government, and courts are limited to the exercise of judicial power in interpreting and applying the law"); *Solomon v. State*, 303 Kan. 512, 545, 364 P.3d 536 (2015) (Stegall, J., concurring) ("when 'the Government is called upon to perform a function that requires an exercise of legislative, executive, or judicial power, only the vested recipient of that power can perform it'").

For these reasons, I dissent.